IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JAMES F. HOSKINS, | * | |
| *Pro Se* Plaintiff, | * | |
| v. | * | Civil Action No. RDB-12-0639 |
| JANET NAPOLITANO, SECRETARY OF HOMELAND SECURITY, et al., | * | |
| | * | |
| Defendants. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

Plaintiff James Hoskins ("Plaintiff"), *pro se*,[1] is a former civilian employee of the United States Coast Guard ("USCG"), who has filed suit against Defendants Janet Napolitano, Secretary of Homeland Security, and the USCG (collectively the "Defendants"), alleging violations of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* ("FTCA"), and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, also alleging negligent and reckless infliction of emotional distress. (Complaint, ECF No. 1, ¶¶ 1-3.)   Plaintiff claims he was subjected to a hostile work environment and discriminatory treatment in the workplace based on both race and disability. (*Id.*)

---

[1] In a telephone conference with the Court on October 15, 2012, an attorney by the name of Damond Carter sought to be admitted *pro hac vice* on Plaintiff's behalf. At that time he requested waiver of Local Rule 101.1(b)(i), which essentially notes that any party represented by an attorney who has been admitted *pro hac vice* must also be represented by an attorney who has been formally admitted to the bar of this Court. Mr. Carter's initial request was denied by letter order of this Court on October 15, 2012 (ECF No. 21), and he renewed it on November 6, 2012. (ECF No. 23.)   As of the date of this opinion, Mr. Carter has yet to comply with the local rule, and no attorney admitted to the bar of this Court has appeared on Plaintiff's behalf.

Plaintiff was removed from his position with the USCG after he failed to obtain the necessary security clearance. He contends that the USCG imposed the security clearance requirement only after, and in retaliation for, his filing of a Freedom of Information Act[2] ("FOIA") request seeking information about an individual at the workplace with whom he had had several disputes. (*Id.* ¶ 1.) He further alleges that the USCG's ultimate decision not to grant him a security clearance was retaliation for his filing of an Equal Employment Opportunity ("EEO") complaint.[3] (*Id.* ¶ 28.) Finally, Plaintiff contends that his due process rights were violated when he appealed the denial of the security clearance. (*Id.* ¶ 62.)

Pending before this Court is Defendants' Motion to Dismiss or, Alternatively, for Summary Judgment (the "Motion"). (ECF No. 13.) Defendants claim that they had a non-discriminatory reason to suspend and discharge Plaintiff, as he was unable to obtain a security clearance—a legitimate precondition to his employment and a decision not reviewable by this Court. (Memorandum of Law in Support of Motion ("Defendants' Memorandum") (ECF 13) at 18-19.) Secondly, they contend that Plaintiff's FTCA claims must be dismissed for failure to exhaust administrative remedies. (*Id.* at 17-18.) Finally and alternatively, they argue that they are entitled to summary judgment on his remaining claims because even viewing the facts in the light most favorable to Plaintiff, he has failed to show either a disability or severe and pervasive discrimination, and because his claims have been heard and rejected at an administrative hearing. (*Id.* at 21-25.) In his Opposition, Plaintiff

---

[2] 5 U.S.C. § 552.
[3] 42 U.S.C. § 2000e *et seq.*

argues that discovery is necessary[4] and summary judgment is inappropriate at this stage in the litigation (Opp'n. (ECF No. 16) at 4), and that Defendant USCG and the USCG Security Center engaged in a "cat's paw" theory of discrimination (*id.* at 6).[5]

A hearing on Defendants' Motion to Dismiss and for Summary Judgment (ECF No. 13) was held on November 8, 2012.[6] At the hearing, this Court indicated that Defendants should provide the administrative record that was before the Merit Systems Protection Board ("MSPB") (discussed *infra*), and in keeping with the Court's directive, on November 16, 2012, Defendants filed a Motion to Supplement Exhibits ("Motion to Supplement'). (ECF No. 28.)  The Motion to Appear Pro Hac Vice on Behalf of Plaintiff ("Motion to Appear") by one Damond Carter, filed on November 6, 2012, (ECF No. 23) remains pending due to his continued failure to comply with Local Rule 101.1(b)(i).  His first request to appear was denied by letter order on October 15, 2012. (ECF No. 21.)

Following the hearing on the Motion for Summary Judgment, and without seeking leave of the Court, on November 10, 2012 Plaintiff filed an "Addendum" to his Reply to the Motion for Summary Judgment (ECF No. 25), and then on November 13, 2012 he filed an "Amendment to Addendum" (ECF No. 26) (collectively termed the "Surreplies"). Defendants filed a Motion to Strike the surreplies on November 14, 2012 ("Motion to Strike").  (ECF No. 27.)

---

[4] On October 1, 2012 Plaintiff filed a Motion for Sanctions (the "Sanctions Motion") in which he argued that he has not been afforded proper discovery "throughout the complaint process."  (Sanctions Motion (ECF No. 19) at 1-2.)  This Court denied the Sanctions Motion by Letter Order dated October 16, 2012.  (ECF 21.)

[5] The "cat's paw" theory is attributed to a fable, "The Monkey and the Cat," and refers to one person being used unwittingly by another to accomplish his purposes.  *See infra* note 11; *Staub v. Proctor Hospital*, 131 S.Ct. 1186, 1190 n.1 (2011).

[6] The *pro se* Plaintiff did not appear but was given permission to participate by telephone.

For the reasons stated below, Defendants' Motion to Strike (ECF No. 27) and Motion to Supplement (ECF No. 28) are GRANTED; the Motion to Appear (ECF No. 23) is DENIED; the Motion to Dismiss or for Summary Judgment (ECF No. 13) is GRANTED, and summary judgment shall be entered in favor of the Defendants.

## FACTUAL BACKGROUND

This Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). On January 7, 2007, Plaintiff began his job with the USCG as an Ordnance Equipment Worker ("OEW") at the USCG facility in Baltimore, Maryland (known as the "Yard" (Mot. at 3)). (Compl. ¶ 7.) His duties were "to perform depot level maintenance on the MK 75, 62MM gun system." (*Id.* ¶ 10.) On January 8, 2007, one day after his entry on duty ("EOD"), he signed a form acknowledging that as part of the process, he was required to fill out an SF-86 Questionnaire for National Security Positions ("SF-86") within five days of his appointment. (Mot. Ex. 2.) It appears that Plaintiff actually signed the SF-86 on January 18, 2007.

The SF-86 represents that the "sensitivity level" of Plaintiff's position is a "2." (SF-86 Part 1.) A position sensitivity designation of "PS-2" means that the job is "noncritical-sensitive," which is defined as follows: "Position sensitivity designations indicating the potential for *moderate to serious impact* on the integrity and efficiency of the service or on national security. (*Secret\Level 2*)." (USCG Commandant Instruction M5520.12c, "Personnel Security and Suitability Program," MSPB Administrative Record ("MSPB Admin. R.") at 254 (emphasis added).) The position of OEW for which Plaintiff was hired requires a security clearance not only as indicated on the SF-86 as a PS-2, but also according to Karla Brown,

who is a Human Resources Specialist in the USCG Office of Civilian Human Resources ("USCG HR").  (Affidavit of Karla Brown ("Brown Aff."), Mot. Ex. 6, ¶¶ 2, 4.)  Moreover, the individual who held the position before Plaintiff had a security clearance, as did his co-workers.[7]  (*Id.* ¶ 4; Affidavit of John Driscoll ("Driscoll Aff."), Mot. Ex. 14, ¶ 12; Affidavit of Dale Strucko ("Strucko Aff."), Mot. Ex. 22, ¶ 12.)

In responses on the SF-86, Plaintiff made certain representations about his background.  He stated that he had been arrested once in April 2006 for assault (SF-86, Mot. Ex. 3, at 7 ¶ 23); that he had not "*ever* used a controlled substance while possessing a security clearance" (*id.* at 8 ¶ 24(b) (emphasis in original)); and that he had not ever had a security clearance denied, revoked, or suspended (*id.* at 8 ¶ 26(b)).

Once an individual is hired to work at the Yard, a process is initiated to obtain for that employee an "interim" security clearance.  (Brown Aff. ¶ 5.)  According to Brown, "[i]t is HR's responsibility to submit interim security clearance requests for all new hires," and accordingly she "submitted the interim security clearance request because Plaintiff's position required a security clearance."  (*Id.*)  From the Yard, the SF-86 and other documents relating to Plaintiff's employment were forwarded to the USCG Civilian Personnel Security Center ("SECCEN") in Chesapeake, Virginia on February 16, 2007 for continuation of the security clearance process.  (*Id.* ¶ 3; Personnel Security Cover Checklist, Mot. Ex. 5.)

---

[7] It appears that the position had been designated "noncritical sensitive" – *i.e.*, a PS-2 – for some time.  The MSPB administrative record contains a 1992 description of the OEW position at the Yard designating the position as "2-Noncritical sensitive."  (MSPB Admin R. at 289.)  Moreover, an additional write up detailing "typical work performed" by an OEW suggests that the position involves work on systems where a security clearance is appropriate: the OEW "works from blueprints, schematics, drawings, sketches and specifications, he installs, overhauls, modifies and repairs defective mechanical, electrical and hydraulic elements of ordnance equipment such as … guns and mounts … and torpedo tubes."  (*Id.* at 290.)

Plaintiff worked at the Yard for approximately eight months seemingly without incident.  On September 5, 2007, however, his co-worker Paul Flanagan filed a hostile work environment claim based on comments Plaintiff had made to him in April, May, and August of 2007.  (September 5, 2007 Letter from Paul Flanagan, Mot. Ex. 8.)  Flanagan alleged that Plaintiff accused him of having an inappropriate relationship with a co-worker, made disparaging remarks about his relationship with his wife, and told a story in which he – Plaintiff, not Flanagan – repeatedly used the word "n*****."  (*Id.*)  Flanagan also claimed that Plaintiff attempted to "race bait" other employees, caused disturbances and challenged work instructions, and blamed his co-workers for his own poor work quality.  (*Id.*)  According to Flanagan, Plaintiff's "constant loud and accusatory arguments and rebuttals have caused a breakdown in good order and discipline."  (*Id.*)

Plaintiff replied to these accusations with a letter of his own.  (September 6, 2007 Letter from James Hoskins, Mot. Ex. 9.)   He admitted that there were incidents but disagreed as to what they were.  He admitted communicating to Flanagan that he was aware Flanagan had dated a co-worker, and to "be careful" about it (*id.* at 1); he recalled "questioning [Flanagan] in regards to not using any personal protective equipment" (*id.*); he admitted recounting a saying he attributed to his grandfather regarding "n*****s" (*id.* at 1-2); and he denied race baiting or producing inferior work (*id.* at 2).

Also on September 6, 2007, Flanagan filed a written complaint in which he alleged that Plaintiff followed him from the Yard to his car and "stalked" him, intimidated him, and informed him that he (again Plaintiff, not Flanagan) had a concealed weapons permit and had been convicted of assault and battery on a minor.  (September 6, 2007 USCG Police

Statement Form, Mot. Ex. 10.)  In a subsequent interview by EEO Officer Lesly Delney, Plaintiff denied stalking Flanagan, claiming he was giving another employee a ride to his car. (Undated Delney Report, Mot. Ex. 11.)  Delney concluded that Plaintiff had used the word "n*****," had made a comment about Flanagan's relationship with his wife, made racially offensive remarks, and listened to a "borderline offensive" talk radio show.  (*Id.* at 3.)  He then counseled Plaintiff and Flanagan, reviewing with them both the Harrassment and Hostile Work Environment policy, and recommended that Yard employees not be permitted to listen to talk radio or discuss racial issues.  (*Id.* at 4.)  On September 20, 2007, after the investigation was concluded and Delney's recommendations made, Plaintiff made a Freedom of Information Act ("FOIA") request to obtain a copy of Flanagan's EEO complaint and investigation, along with a copy of the police report.  (Compl. ¶ 26.)

On September 24, 2007, emails were exchanged among individuals within the USCG (whose names have been redacted on the relevant document), relating to Plaintiff's interim secret clearance.  (*See* Opp'n. Ex. 18 at 7-8.)  The authors of these emails appear to express concern that the investigation into Plaintiff's security clearance has taken too long; they do not, however, express any doubt that a security clearance is required for Plaintiff's position, nor do they reference Plaintiff's race, any disability, or any disagreement between Plaintiff and Flanagan.

According to the Complaint, Plaintiff contracted the Human Immunodeficiency Virus ("HIV") in 1995.  (Compl. ¶¶ 12, 15.)  Plaintiff was hospitalized on November 4, 2007 at the National Naval Medical Center ("NNMC") in Bethesda, Maryland for a condition that appears to have been unrelated to his HIV-positive status.  (April 30, 2008 Hoskins Letter,

Mot. Ex. 12, at 1[8].)    Plaintiff had several confrontations with physicians there, which resulted in his filing a complaint about the conduct of various hospital personnel. (*Id.* at 2-3.) Plaintiff also filed a complaint with the United States Department of Health and Human Services, Office for Civil Rights ("DHH OCR"), alleging a violation of privacy based on a physician's purported disclosure of his HIV-positive status in front of one of Plaintiff's family members during his hospital stay. (March 16, 2009 Letter from Paul Cushing, Regional Manager, DHH OCR, Opposition Ex. 22, at 1.)   In response, the OCR manager concluded that the NNMC had taken appropriate action "to address the Privacy Rule issues raised" with respect to plaintiff's allegations.   (*Id.*)   He also determined that while one of Plaintiff's physicians did provide him a note allowing him to return to work, any evidence "provided by [Plaintiff] for alleging an impermissible disclosure by this physician [to Plaintiff's employer] is speculative."   (*Id.*)

The referenced note is an undated memo from Lieutenant J.A. Wong-Lopez, one of the physicians who treated Plaintiff, stating that he was hospitalized and unable to work from November 4 through November 15, 2007.   (Opp'n. Ex. 23.)   It does not state any particulars regarding Plaintiff's condition.   (*Id.*)   Plaintiff nonetheless alleges that based on his providing that note to Defendants, his supervisor, John Kemmerer, "made public … Plaintiff's HIV status, which contributed to … Plaintiff's hostile work environment, as a result of co-workers['] speculation as to how … Plaintiff contracted HIV."   (Compl. ¶ 12.) Plaintiff alleges that when his co-workers learned of his HIV-positive status, they "began

---

[8] Although Plaintiff repeatedly states in the complaint letter that the hospitalization occurred in 2008, his letter is dated April 30, 2008 so the hospitalization would have occurred in November of 2007.  It is also plain based on the Complaint and the note submitted to the USCG discussed *infra* that the hospitalization took place in 2007.  (Compl. ¶ 16; Opp'n. Ex. 23.)

making jokes about … Plaintiff regarding what [they] thought to be … Plaintiff's homosexuality and … Plaintiff's HIV status (e.g. in an April 21, 2008 incident Richard Razinsky publicly accused the Plaintiff of wearing dresses)." (*Id.* ¶ 17.)

On February 14, 2008, Flanagan filed another complaint against Plaintiff, alleging that Plaintiff approached him at work claiming to have found Flanagan's name on a salacious website, along with a video of Flanagan performing certain unsavory acts. (February 22, 2008 Meeting Report, Mot. Ex. 13, at 1.) Flanagan also alleged that Plaintiff came to his workstation later the same day with a dozen roses, stating that they were "for the biggest queer in the Coast Guard." (*Id.*) Plaintiff admitted to giving the roses to Flanagan and calling him "queer," ostensibly because he overheard Flanagan referring to him as "the gay guy." (*Id.*) Flanagan dropped the charges against Plaintiff because he did not wish to file a formal complaint and requested that Plaintiff "do his job and keep his personal comments to himself." (*Id.* at 2.)

Plaintiff complained about various of his co-workers from December of 2007 through June of 2008, specifically as follows:

- On December 28, 2007, Plaintiff allegedly discovered Flanagan "hiding the gears to the rear slide cover that the Plaintiff was working on." (Compl. ¶ 31.)
- On May 7, 2008, Strucko negligently maintained a pipe, causing hydraulic fluid to hit Plaintiff in the face. (*Id.* ¶ 34.)
- On May 8, 2008, Plaintiff was trying to elevate a gun-barrel and Razinsky began raising the crane, causing the hand-crank to run away from the Plaintiff, which created a "deadly workplace hazard." (*Id.* ¶ 36.)
- On May 9, 2008, Plaintiff asked Razinsky to help him, and Razinsky began yelling, then slammed a metal bracket system on the shelf above Plaintiff's head, "which created a deadly workplace hazard." (*Id.* ¶ 37.)
- On May 29, 2008, someone spit chewing tobacco into a soda can from which Plaintiff had been drinking. (*Id.* ¶ 39.)

- On June 10, 2008, Plaintiff's laptop was allegedly "intentionally destroyed." (*Id.* ¶ 43.)

According to a journal that Plaintiff claims to have kept throughout his employment with the United States Coast Guard ("USCG") (Journal, Opp'n Ex. 1), he submitted a complaint about some of the above-referenced behaviors on June 6, 2008 to Delney as the USCG EEO Officer.  This complaint, along with Plaintiff's claim that his medical status had been disclosed to his coworkers, was addressed at a meeting attended by Plaintiff, Ed Miller (General Foreman), Kemmerer (Shop Supervisor), Charles Zerbe (Industrial Manager), and Delney. (August 29, 2008 Memorandum from Lesly Delney, Mot. Ex. 25.)  At that meeting, Plaintiff

> spoke about the hostile behavior of his co-workers and Management's behavior that he considers "discriminating" because of his medical status that he thought was made public to the shop by Mr. Kemmerer.  [Plaintiff] thought that Mr. Kemmerer, Shop Supervisor, violated (HIPPA) by calling [Plaintiff's] doctor and inquired about his medical status.

(*Id.*)  The parties ultimately agreed that Kemmerer did not in fact contact Plaintiff's doctor, and was not even aware of Plaintiff's medical status. (*Id.*)  Plaintiff suggested at that meeting that others in the shop should "raise the level of professionalism in the work center."  (*Id.*) Also according to Plaintiff's journal, at that meeting either Miller or Zerbe stated that based upon their interviews of other employees, "the general consensus was that everyone was afraid of me.  I asked why.  He stated that they felt that I was a powder keg waiting to blow. I called it the angry black man syndrome, Mr. Zerbe stated that those were my words not his."  (*Id.*)

On August 8, 2008, Plaintiff filed a Grievance Form in which he argued that he was "scheduled to attend" a training session and was informed that Flanagan was going because

he had been at the Yard longer, and Plaintiff could not go because of issues with his security clearance.  (August 6, 2008 Grievance Form, Mot. Ex. 24.)  The request was denied by Miller on August 14, 2008, who stated that depending upon the "outcome of the adjudication of your security clearance every effort will be made to enroll you in a future class," and that three slots had been requested in the budget but only one was available.  (*Id.*)  Plaintiff's claim was addressed in the August 29, 2008 meeting, referenced *supra,* relating to the purported disclosure of his HIV status.  (Mot. Ex. 25.)  Miller again explained in that meeting that Flanagan would attend first as the individual with the most seniority.  (*Id.*)

Over the course of Plaintiff's employment, the investigation into Plaintiff's security clearance continued.  On June 20, 2008, the USCG Civilian Personnel Security Center ("SECCEN") informed Plaintiff in a Letter of Intent that his security clearance would be denied.  (June 20, 2008 Memorandum from Grace Pe ("Letter of Intent"), Mot. Ex. 18, at 1.)  In the Letter of Intent, the then-Acting Director of CG SECCEN informed Plaintiff of "security concerns which raise serious questions as to your eligibility to be granted a security clearance."  (*Id.*)  The concerns cited included: (1) several instances of bad debt; (2) a personal conduct issue because Plaintiff failed to disclose certain financial delinquencies; (3) a "pattern of disruptive, violent, and other inappropriate behavior, some of which occurred within the workplace" (including an October 4, 2005 termination "due to a history of aggressive and confrontational behavior towards [Plaintiff's] supervisor, fellow employees, and government personnel"); (4) a January, 2006 assault and battery charge that led to a one year probationary period, a suspended sentence and a fine; and (5) Plaintiff's failure to disclose a prior denial of security clearance in 1998 after he tested positive for cocaine.  (*Id.*)

As was his right, Plaintiff replied to the Letter of Intent by submitting a letter on July 30, 2008 detailing his responses to the concerns cited. (July 30, 2008 Response to Letter of Intent ("Response"), Mot. Ex. 19, at 1.)

On September 19, 2008, SECCEN issued a Final Decision to Deny Security Clearance to Plaintiff. (September 19, 2008 Final Decision to Deny Security Clearance from James Trommatter, Jr. ("Final Decision"), Mot. Ex. 20, at 1.) Although Plaintiff had provided information that mitigated most financial and some of the personal and criminal conduct issues that had been addressed in the Letter of Intent, the referenced "pattern of criminal conduct" in certain time periods including 2005 through 2006 continued to raise concerns that justified denial of the security clearance. (*Id.*)

Plaintiff appealed the September 19, 2008 SECCEN decision to deny his security clearance to the Personnel Security Appeals Board ("PSAB"), and a hearing was held before the PSAB Board on January 30, 2009. (January 30, 2009 Transcript, Opp'n. Ex. 5.) The Board unanimously concluded that SECCEN came to the appropriate conclusion that Plaintiff was not eligible for a security clearance based on his prior use of cocaine while he held a security clearance and based on

> a history of incidents, arrests, descriptions of aggressive behavior again and again and again, not one, not two, not three, but multiple, up until and including his present employment with – from which he's suspended with the Baltimore [Y]ard, [which] was not contravened by his performance today with the board at all in honesty.

(January 30, 2009 Transcript, Mot. Ex. 28, at 97-98.)

Also on September 19, 2008, Plaintiff was placed on administrative leave, effective immediately. (MSPB Admin. R. at 150.) On November 4, 2008, a Notice of Decision of

12

Proposed Suspension was issued to Plaintiff, placing him on indefinite suspension as of November 10, 2008.  (*Id.* at 58.)

On March 11, 2009, the Merit Systems Protection Board ("MSPB") ruled on Plaintiff's appeal of his suspension pursuant to 5 U.S.C. §§ 7511-13.[9]  In an eleven-page opinion, Administrative Judge Wilhelmina Stevenson ruled first, that Plaintiff's job did require a security clearance, and accordingly that she could not review his discrimination claims as she lacked authority to do so in connection with an indefinite suspension for failing to maintain a valid security clearance.  (March 11, 2009 Initial Decision, Mot. Ex. 27, at 2.) She further concluded that after the denial, Plaintiff was afforded due process based on notification of the decision and his being given the opportunity to respond.  (*Id.*)  Judge Stevenson heard a second appeal, this time based on Plaintiff's permanent removal from his position as an OEW based on his failure to obtain a security clearance, and on February 27, 2010, she affirmed the USCG's decision.  (February 27, 2010 Initial Decision, Mot. Ex. 29, at 1.)

Separate and apart from the above proceedings, Plaintiff followed a complaint process through the Equal Employment Opportunity Commission ("EEOC") relating to his claims that he was subjected to a hostile work environment at the Yard.  In October of 2008 he filed a formal EEO complaint alleging first, a hostile work environment from September 5, 2007 to October 3, 2008 and second, that the USCG discriminated against him "in reprisal for prior EEO activity by first permitting him to fill a job that required a security clearance without having one, and then required him to undergo a process to grant or deny him

---

[9]  At that time Plaintiff's PSAB appeal was pending, and the EEO complaint he had filed did not cover the indefinite suspension decision.  (March 11, 2009 Initial Decision, Mot. Ex. 27, at 2.)

clearance and indefinitely suspend him when the clearance was denied for discriminatory reasons." (Transcript of Proceedings, Mot. Ex. 1, at 4-5.) On June 29, 2010, Judge David Norken held a hearing and granted the USCG's motion to dismiss regarding the second claim. (*Id.* at 5.) He heard the claim that Plaintiff had been subjected to a hostile work environment and in an opinion from the bench on October 10, 2010 Judge Norken determined that Plaintiff failed to establish that USCG discriminated against him on the basis of race or disability by subjecting him to a hostile work environment. (Transcript of Proceedings, Mot. Ex. 16, at 1363-66.)

## **STANDARD OF REVIEW**

Pursuant to Federal Rule of Civil Procedure 12(d), consideration of matters outside the pleadings converts Defendants' Motion to one for summary judgment, rather than a motion to dismiss. *See Sec'y of State for Defense v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (if "matters outside of the pleading are presented to and not excluded by the court," then "the motion must be treated as one for summary judgment under Rule 56"). It is plain that numerous documents outside the pleadings must be reviewed on all of Plaintiff's claims except his FTCA claim, which is subject to a motion to dismiss for lack of subject matter jurisdiction. *See* Discussion, *infra*, part F. Certainly Plaintiff is entitled to some leniency in applying the summary judgment standard discussed *infra*, based on the fact that he is a *pro se* plaintiff, *see Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978), and he has been given leeway in being permitted to file his Opposition late.

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Nonetheless, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249-50.

Specifically, a party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "cannot create a genuine dispute of material fact through mere speculation or compilation of inferences," *Shin v. Shalala,* 166 F. Supp.2d 373, 375 (D. Md. 2001) (citations omitted); *see also Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330-31 (4th Cir. 1998). The summary judgment inquiry "thus scrutinizes the plaintiff's case to determine whether [he] has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). Hearsay or conclusory statements with no

evidentiary basis cannot defeat a summary judgment motion. *Greensboro Prof'nal Fire Fighters Ass'n v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

In employment discrimination cases, "a subjective belief of discrimination, however, genuine, cannot be the basis of judicial relief." *Moore v. Reese*, 817 F. Supp. 1290 (D. Md. 1993). The Fourth Circuit has affirmed summary judgment to a defendant employer when the employer's motives may be in dispute, but the material facts are not. *Mitchell*, *supra*, 12 F.3d at 1318 (4th Cir. 1993) (affirming summary judgment where appellant employee failed to establish *prima facie* case of age discrimination and failed to establish genuine issue of material fact in connection with legitimate, non-discriminatory reason for employer's actions); *Goldberg v. Green*, 836 F.2d 845, 848 (4th Cir. 1998) (ruling that plaintiff's assertions about employer's state of mind and motivation were insufficient to withstand summary judgment).

## DISCUSSION

Two of Plaintiff's claims, those of retaliation and discrimination based on a disability, require as a threshold matter that this Court determine whether Plaintiff's job required a security clearance. If it did, then the USCG's decision not to issue the clearance is unreviewable pursuant to *Department of the Navy v. Egan*, 484 U.S. 518 (1988), and its progeny, and this Court lacks subject matter jurisdiction to hear Plaintiff's retaliation claim to the extent it is based on the denial of a security clearance. With respect to the disability claim, one element of such a claim is that a plaintiff is "qualified" for the position – if he is not, then a disability claim cannot lie as he could not perform the essential functions of the position, regardless of whether or not the disability was proved to exist. *See* 29 C.F.R. § 1630.2(m) (discussed *infra* part D). The question of whether Plaintiff "qualifies" for the

position and therefore falls within the statute's purview is a preliminary question of law, not a question of fact for a jury. *Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001)(holding that whether the plaintiff was "disabled" under the Rehabilitation Act and could bring a claim under the statute is a preliminary question for the court to resolve).

A.      The Security Clearance Requirement

The mandate that security clearance decisions are not reviewable has its origins in *Department of the Navy v. Egan*, 484 U.S. 518 (1988), in which the United States Supreme Court held that the Merit Systems Protection Board did not have authority to review the substance of an underlying decision to deny or revoke a security clearance, because such review would "intrude upon the authority of the Executive in military and national security affairs." *Id.* at 530.  Consistent with this principle, in *Guillot v. Garrett*, 970 F.2d 1320 (4th Cir. 1992), the United States Court of Appeals for the Fourth Circuit held that a court could not review security clearance decisions for violations of the Rehabilitation Act, where the claimant lost his security clearance after a periodic security investigation.

In *Becerra v. Dalton*, 94 F.3d 145 (4th Cir. 1996), the Fourth Circuit extended the reach of the doctrine further, holding that the Navy's decision to investigate an employee and revoke his security clearance was unreviewable.  The Navy began a security investigation that Becerra alleged was false and in retaliation for his filing of EEO complaints.  He argued that *Egan* and its progeny did not apply because the question of whether the *instigation* of a security clearance investigation was a form of retaliation was judicially reviewable.  The Fourth Circuit rejected this argument, explaining that "the distinction between the initiation of a security investigation and the denial of a security clearance is a distinction without a

difference." *Id.* at 149. Specifically, whether the Navy had adequate reason to investigate Becerra as a potential security risk was itself a question of agency discretion, and indeed "the reasons why a security investigation is initiated may very well be the same reasons why the final security clearance decision is made. Thus, if permitted to review the initial stage of a security clearance determination to ascertain whether it was a retaliatory act, the court would be required to review the very issues that the Supreme Court has held are non-reviewable." *Id.* at 149.

In this case, the *pro se* Plaintiff Hoskins attempts to demonstrate that the job did not require a security clearance by pointing to a job posting about the OEW position in which that condition was not specified. (Opp'n Ex. 3.) The posting does not specifically state that the job is a "PS-2" or that it requires a security clearance beyond a standard background check. (*Id.*) Plaintiff has not adequately explained, however, why the absence of that requirement in a job posting matters, when Plaintiff subsequently signed the SF-86 that specifically stated that the security level for the job was a "2." (Mot. Ex. 2.) Indeed after he signed that form, it is clear that the process relating to the security clearance was first put in motion in February 2007, within weeks of Plaintiff's hire, when his SF-86 and other materials were sent to the USCG Civilian Personnel Security Center ("SECCEN"). (Mot. Ex. 5, Personnel Security Cover Checklist.)

Plaintiff also claims, with respect to the security clearance, that he received treatment different from Flanagan, in that Flanagan was granted a security clearance despite his having a criminal background. (Compl. ¶ 53.) That Plaintiff had an ongoing gripe about Flanagan is evident based on their complaints about one another and Plaintiff's constant raising of

irrelevant issues pertaining to Flanagan's background check and investigation into his security clearance.  (*Id*; Hoskins Aff., Opp'n. Ex. 4, ¶ 9; Opp'n. at 5.)  Flanagan's treatment has absolutely no bearing on the issues surrounding Plaintiff's conduct or the investigation relating to his security clearance.

There is indisputable evidence establishing that Plaintiff's position required a security clearance, and has for almost twenty years.  (MSPB Admin. R. 289.)  First, the SF-86 which Plaintiff signed designates the position's sensitivity level as a "2," which is a noncritical sensitive position requiring a security clearance.  (SF-86 Part 1; MSPB  Admin. R. at 254.)  Second, the Human Resources worker at USCG averred that the job did so require, both for Plaintiff's predecessor and for Plaintiff.   (Brown Aff. ¶ 4.)   Finally, Defendants have provided the affidavits of other employees at the Yard whose jobs required security clearances.  (Driscoll Aff. ¶ 12; Strucko Aff. ¶ 22.)

Because the OEW position that Plaintiff occupied required a security clearance, this Court lacks jurisdiction to review it.  *Department of the Navy v. Egan*, 484 U.S. 518 (1988); *Guillot v. Garrett*, 970 F.2d 1320 (4th Cir. 1992); *Becerra v. Dalton*, 94 F.3d 145 (4th Cir. 1996). Thus, before even addressing Plaintiff's retaliation and Americans with Disabilities Act claims, summary judgment is required on these claims.   Nevertheless, for purposes of completeness of the record, this Court will address the substance of these and Plaintiff's remaining claims below.

B.      The Retaliation Claim

Plaintiff claims that he was retaliated against in two separate and distinct ways.  First, he claims that in response to his filing of a FOIA request on September 20, 2007 to obtain

19

copies of Flanagan's EEO complaint and investigation, the USCG "changed the conditions" of his employment to then require a secret clearance, causing an interim security investigation against the Plaintiff to be initiated.  (Compl. ¶ 28.)  Second, he claims that he was denied the opportunity to attend a training seminar in June of 2008, and that Flanagan was selected over him, in retaliation for his (Plaintiff's) filing an EEO complaint.  (*Id.* ¶ 44, 45.)

As a preliminary matter, to the extent Plaintiff claims that the ultimate decision not to grant him a security clearance subsequent to his EEO filings forms the basis of a retaliation claim, obviously that decision is unreviewable under *Egan*.  Furthermore, Plaintiff cannot establish a causal connection between the two activities – complaint and investigation – in light of the fact that the general investigation into his security clearance preceded his own EEO claim.  That is, the materials relating to the investigation were forwarded to SECCEN on February 16, 2007.  (Brown Aff. ¶ 3; Personnel Security Cover Checklist, Mot. Ex. 5.) The security clearance investigation was renewed in September of 2007 (Opp'n. Ex. 18 at 7-8,) well before Plaintiff complained to Delney about working conditions in the summer of 2008 and thereafter.  (Mot. Ex. 25.)

Moreover, as discussed *supra* part A, Plaintiff cannot demonstrate as a matter of law that his job did not require a security clearance, specifically that the requirement of a security clearance was imposed after and in retaliation for his filing a FOIA request on September 24, 2007.  Even if he could demonstrate that this was the case, as a matter of law it is not material, because Plaintiff cannot show that the filing of the FOIA request was a "protected activity" within the ambit of those activities protected under Title VII.

20

The antiretaliation provision of Title VII of the Civil Rights Act[10] seeks to secure the primary objective of the title – protecting against discrimination – "by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).   In order to establish a *prima facie* case for retaliation, a plaintiff must show (1) that he engaged in a protected activity; (2) that the employer acted adversely against him; and (3) that there was "a causal connection between the protected activity and the asserted adverse action." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011).   If a plaintiff puts forth enough evidence to establish this *prima facie* case, the burden then shifts to the defendant to offer a legitimate, non-retaliatory justification for the adverse action.   If the defendant does so, the onus is then on the plaintiff to establish that the employer's proffered explanation is pretext for retaliation.   *Yashenko v. Harrah's NC Casino, Inc.*, 446 F.3d 541, 551 (4th Cir. 2006); *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 258 (4th Cir. 1998); *see also McDonnell Douglas v. Green*, 411 U.S. 792 (1973) (establishing burden-shifting framework).

The "protected activity" that forms the foundation of a retaliation claim is generally activity relating to a Title VII claim. *See Vasconcelos v. Meese,* 907 F.2d 111, 113 (9th Cir.1990) ("The purpose of section 2000e-3's participation clause is to protect the employee who utilizes the tools provided by Congress to protect his rights." (internal quotation marks omitted)); *see also Laughlin*, *supra*, 149 F.3d at 259 (4th Cir. 1998).   Activities that constitute participation are outlined in the statute: (1) making a charge; (2) testifying; (3) assisting; or (4)

---

[10] 42 U.S.C. § 2000e *et seq.*

participating in any manner in an investigation, proceeding, or hearing under Title VII. *See* 42 U.S.C.A. § 2000e-3(a). Participatory activities are vigorously protected to ensure employees' continuing access to the EEOC and the enforcement process. *Laughlin*, 149 F.3d at 259. This Court has previously recognized that instances of such activity typically include some allegation of impropriety relating to underlying discrimination.  *See, e.g., Romeo v. APS Healthcare Bethesda, Inc.*, 2012 WL 1852264 at *5 (D. Md. 2012) (holding that plaintiff's fax complaint to human resources director constituted protected activity, as it made it abundantly clear to employer that plaintiff was complaining of race and gender discrimination).  *Compare Nathan v. Takeda Pharmaceuticals America, Inc.*, 2012 WL 3686737 at*12 (D. Md. 2012) (holding that even though plaintiff had complained to human resources department about conversations with supervisor, he could point to no evidence other than his own subjective believe that he was being targeted and complaint to HR was not "protected activity").

In this case, the *pro* se Plaintiff Hoskins has failed to show that he participated in any process protected under the antiretaliation provisions of Title VII before the security clearance investigation was pursued.  The only activity he alleges took place prior to the security clearance investigation coming to the attention of USCG personnel on September 24, 2007, was his filing of a FOIA request on September 20, 2007, in which he sought to obtain information about the complaint *Flanagan* had filed against *him*.  Such activity is not protected.  His filing of a FOIA complaint did not constitute an action under Title VII akin to the filing of an EEO complaint – *i.e.*, an employment-related practice – nor could it in any sense have given rise to a belief on the part of USCG personnel that Plaintiff would soon be

subjected to discrimination – whether by dint of a hostile work environment through racial discrimination or by instigation of a security clearance investigation.  *See Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 340 (4th Cir. 2006) (determining under an "objective-reasonableness inquiry" that plaintiff could not have reasonably believed that he was complaining of a hostile work environment with underlying complaint, that his complaint therefore was not a "protected activity").   The fact that Flanagan had filed an EEO complaint certainly cannot be used by Plaintiff to attempt to avail himself of protections which, at that point, were available to Flanagan if they were available to anyone.

Moreover, with respect to the September 24, 2007 email exchange among USCG personnel, while these emails certainly point to concerns that the decision regarding Plaintiff's security clearance has been delayed longer than appropriate, there is nothing in them that suggests any of the following: (1) that any of the emails' authors knew about Plaintiff's FOIA request or the ongoing problems between him and Flanagan; (2) that the authors were aware of Plaintiff's race; or  (3) that the authors were aware of any issues with Plaintiff's conduct in the Yard.  (Opp'n. Ex. 18 at 7-8.)  If anything, the concern expressed seems to be that the delay in making a determination about Plaintiff's security clearance did not follow appropriate procedure and was indeed, as counsel for Defendants suggested at the hearing, attributable to "governmental bumbling."[11]  Notably, one email suggests based on the problems with the security clearance process simply transferring plaintiff to "another

---

[11] These emails similarly fail to support Plaintiff's "cat's paw" theory of liability, that Plaintiff's supervisors at the Yard were attempting to manipulate SECCEN to push him out.  *See Staub v. Proctor Hospital*, 131 S. Ct. 1186, 1194 (2011) (articulating the principle that "if a supervisor performs an act motivated by [discriminatory] animus that is intended to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable.").  Here Plaintiff has failed to allege any facts to suggest that there was any discriminatory animus on the part of USCG personnel and, further, he has failed to allege any facts to show that USCG personnel attempted to influence the security clearance investigation or had any inappropriate contact with SECCEN.

trade shop not requiring a clearance" (*id.* at 7) – certainly not a suggestion of retaliation, but simply an alternative solution to address (or circumvent) the fact that the decision regarding a pre-existing requirement of a security clearance had not been resolved.

Plaintiff's remaining retaliation claim, that he was denied training in August of 2008, fails for yet an additional reason. Even if Plaintiff's complaints to human resources constitute a "protected activity" because his own complaints predate the training request, Plaintiff still has failed to show any causal connection between that protected activity and the denial of training. Thus he has failed to satisfy his initial burden under *McDonnell Douglas*, *supra*. Further, even if he were able to do so, the burden would then shift to Defendants to establish that they had a non-discriminatory reason for the action, which they have done – to wit, that they selected Flanagan for the training because he was more senior than Plaintiff and indeed for the additional reason that Plaintiff's security clearance had not issued. (Mot. Ex. 24, 25.) Because Plaintiff has failed to establish a *prima facie* case of retaliation *or* carry his burden under *McDonnell Douglas*, the retaliation claims must fail and Defendants are entitled to summary judgment.

C.      Hostile Work Environment Claim

Plaintiff claims he was subjected to a hostile work environment because of his race and his HIV-positive status. Title VII creates a cause of action for a hostile work environment, and to survive summary judgment on such a claim based on race, a plaintiff must "demonstrate that a reasonable jury could find [the] harassment was (1) unwelcome; (2) based on race; and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." *EEOC v. Xerxes*, 639 F.3d 658, 668 (4th Cir. 2011).

This Court notes preliminarily, with respect to Plaintiff's HIV-positive status, that he cannot allege a hostile working environment based on disability as he cannot meaningfully suggest that his HIV-positive status had any impact at the workplace at all.  Plaintiff has not produced any medical evidence that he is in fact HIV-positive, other than through his own assertions in his complaint when hospitalized at the National Naval Medical Center. Moreover, he has not alleged that his status affected his job in any way or indeed that anyone at the workplace knew that he was HIV-positive.  Even assuming coworkers were aware of it, the knowledge that he was HIV-positive played no discernible role in his co-workers' conduct.  The only incident he could specifically tie to his status is a single comment by a fellow employee who accused Plaintiff of wearing dresses (akin more to a playground barb than an insult carrying with it animus that would give rise to a Title VII claim).

With respect to Plaintiff's race-based hostile work environment claim, he also falls well short of the legal standard imposed under Title VII.  The abusive or hostile environment must be objectively hostile, not just subjectively so.  *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011).  The court can consider this component by examining: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.*

Plaintiff cannot point to anything other than several incidents from different coworkers in which he and the co-worker *each* were at fault for exchanging exactly the type of "petty" and "rude" comments that may make for an unpleasant, but not "hostile" work environment within the ambit of Title VII. *See EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306,

315-16 (4th Cir. 2008) ("complaints premised on nothing more than 'rude treatment by [coworkers], 'callous behavior by [one's] superiors,' or a 'routine difference of opinion and personality conflict with [one's] superiors,' are not actionable under Title VII). Plaintiff's status as an African-American does not, standing alone, give rise to a Title VII claim. *Combs-Burge v. Rumsfeld*, 170 Fed. Appx. 856, 862 (4th Cir. 2006) (noting, where plaintiff alleged that supervisor was friendlier to white employees than to her, "general complaints of rude treatment are not sufficient to sustain a hostile work environment claim").

Plaintiff alleges for the first time in the Opposition that he was called a "monkey" by an unidentified coworker. (Opp'n. at 14.) Yet Plaintiff seems to miss the point that Title VII does not provide redress for an individual who, even as he puts it, have not been afforded "the same courtesies as his coworkers." (Hoskins Aff. ¶ 11, Opp'n. Ex. 4) The United States Court of Appeals for the Fourth Circuit has explained that "fundamental to Title VII jurisprudence … is [the] difference between an isolated racial slur, which is always and everywhere inappropriate, and the sort of severe or pervasive conduct that creates a hostile work environment." *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 340 (4th Cir. 2006).

Plaintiff had a seemingly poor relationship with a new supervisor, John Kemmerer, from the start. He stated in one letter to his EEO officer that Kemmerer had a "reputation of vindictiveness and retaliation" and that "the level of professionalism in the work center has decreased" since being under Kemmerer. (June 8, 2008 Memorandum from Hoskins to Zerbe, Opp'n. Ex. 26, at 1, 2.) He agreed at the EEOC hearing that his co-workers were trying to "sabotage his opportunities for career advancement" at the Yard, and that they were "intimidated" and "felt insecure" about his superior work experience, and that this was

why they were trying to provoke him.  (June 29, 2010 Transcript, Mot. Ex. 1, at 330.)  This argument undercuts Plaintiff's claim that the conduct was race-based, and suggests that even assuming Plaintiff's allegation that there was some animus toward him is true, at worst it was jealousy that motivated his coworkers rather than any racial animus.  Plaintiff has not offered any evidence to suggest a race-based motive for the conduct, and indeed it appears that other motives – from the one he has alleged of jealousy, to the one he denies of a clear inability to get along – are rampant.

To the extent Plaintiff claims the working environment was unsafe, the instances he points to do not support a claim of a hostile working environment.  Again he has failed to show that there was any race-based animus in any conduct of the part of his coworkers, such as the May 7, 2008 incident involving hydraulic fluid or the May 9, 2008 incident with Razinsky and the metal shelf.  The job description for an OEW specifically states that working conditions for the job can be hazardous (which seems evident based upon the nature of the job).  A description submitted before the MSPB explains that "throughout the performance of his duties, the employee is exposed to various shipyard hazards and possible injuries."  (MSPB Admin. R. at 292.)

Plaintiff has not provided in the pleadings, nor was he able to offer at the hearing, any evidence that there was any racial or disability-based animus, as opposed to simply tension and people not getting along in the workplace.  Indeed, Plaintiff's own temperament in the workplace was as likely the cause for tension as any other individuals, and to the extent anyone in the workplace openly used racial epithets it appears that, almost without

exception, Plaintiff was the offending party.[12]   Accordingly, summary judgment will be granted with respect to the claim of a hostile working environment

### D.      Disability Claim

Plaintiff filed suit under the Americans with Disabilities Act ("ADA"), but the Rehabilitation Act of 1973, 29 U.S.C. § 710 *et seq.* provides the exclusive remedy for federal employees claiming disability discrimination.  *Brown v. Hunt*, 2000 U.S. Dist. LEXIS 19619 at *6 (D. Md. 2000).   Courts regularly rely on cases construing the ADA to resolve claims under the Rehabilitation Act.  *Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001).

An individual seeking recovery for disability discrimination under the Rehabilitation Act must establish that he or she is a "qualified individual with a disability."  29 C.F.R. § 1630.2(m).  Based on Plaintiff's inability to obtain the required security clearance he could not "qualify" for the position and therefore cannot satisfy an element of the claim. Moreover, even if he could do so, he also cannot show that he had a disability that would give rise to a claim.  An "individual with a disability" is someone who has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment."  29 USC § 705(20)(B) (cited in *Hooven-Lewis, supra*, 249 F.3d at 269).  The

---

[12] Indeed, Plaintiff's disputes extended beyond the workplace into the courts on two separate occasions.  On August 4, 2008, Plaintiff filed a civil suit against Flanagan in the Circuit Court for Anne Arundel County, *James Hoskins v. Paul Flanagan*, 02-C-08-133531 IT  (Motion for Judgment, Mot. Ex. 23), which he agreed to dismiss in the course of the meeting with his supervisors discussed *supra*.  (August 29, 2008 Memorandum from Lesly Delney, Mot. Ex. 25.)  In that suit he alleged that the statements made by Flanagan in connection with Flanagan's September 5, 2007 hostile work environment claim were defamatory and sought $50,000 in punitive damages.  (*Id.*)  Following the hearing before the Personnel Security Appeals Board, Plaintiff filed suit in the Circuit Court for Anne Arundel County, *James Hoskins v. Brian McTague*, Case No. C-10-148893, against one of the testifying officers for libel.  (Motion for Judgment, Mot. Ex. 30, at 2-3.)  That complaint was removed to this Court and dismissed on March 17, 2011 for lack of subject matter jurisdiction (*i.e.*, failure to exhaust administrative remedies by filing an FTCA complaint first with the agency, the USCG.).  *James Hoskins v. Brian McTague*, Civ. No. CCB-11-371. (March 17, 2011 Order, Mot. Ex. 30, at 1.)

disability must limit functions "such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1614.2039(a)(3); *see also, e.g., Heiko v. Colombo Savings Bank*, 434 F.3d 249, 255 (4th Cir. 2006) (holding that waste elimination due to renal failure and subsequent kidney dialysis constituted "major life activity").

In this case, Plaintiff has made absolutely no showing that he is limited in any way or cannot perform his day to day activities.  He specifically alleged in the Complaint that while his impairment "*does not affect [his] day to day activities*, such as eating and dressing, under certain conditions (e.g. inclement weather), [his] physical well being is affected."  (Compl. ¶ 15 (emphasis added).)  His own admission that his HIV-positive status does not affect his day-to-day activities is, at the outset, a basis for granting summary judgment.  Moreover, putting aside that he has not proffered any evidence that anyone at USCG knew about his disability, he has also not alleged that there was any accommodation that was not made, or any decision that was made, that could even arguably be based on his HIV-positive status.

Finally, it merits mention that Plaintiff has also failed to show that he suffered any discrimination based on his HIV-positive status.  The only comment made by anyone that he has specifically connected to it is the comment that he "wears dresses" – a comment unconnected to his status.  Because he can satisfy no element of the claim, this Court grants summary judgment to Defendants with respect to his disability claim

E.      Due Process Claim

Plaintiff alleges that he was not afforded due process in bringing his claims before the Merit Systems Protection Board ("MSPB").  In order to prove that his suspension or

dismissal violated due process, Plaintiff must establish that his employer "did not afford him adequate procedural protections in connection with the action." *Richardson v. Felix*, 856 F.2d 505, 507 (3rd Cir. 1988) (citing *Federal Deposit Ins. Corp v. Mallen*, 486 U.S. 230 (1988)).  Non-discrimination claims decided by the MSPB are reviewed on the record to determine whether the MSPB's actions, findings or conclusions are: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c); *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265-66 (4th Cir. 2001). "Substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Frederick v. Dep't of Justice*, 73 F.3d 349, 352 (Fed. Cir. 1996) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

In her February 27, 2010 opinion, Judge Stevenson expounded with clarity upon the factual background of Plaintiff's employment with the USCG based upon the record before her, and underwent a thorough legal analysis based on those facts, reaching the same conclusion that this Court has – to wit, that Plaintiff's job required a security clearance and that accordingly the decision to remove him was not reviewable under *Egan, supra*.  (MSPB Admin. Rec. at 328-30.)  She went on to consider whether Plaintiff had been provided with adequate procedural protections, specifically the appropriate written notice, a reasonable time to answer, the opportunity to be represented, and a written decision and the specific reasons therefor, and determined that the processes followed were in compliance with due process.  (*Id.* at 331-33.)

Based on Judge Stevenson's analysis, this Court does not find that her rulings were arbitrary and capricious; to the contrary, they were supported by ample evidence in the record before her, and due process was afforded to Plaintiff at every stage of appeal of his claims to the MSPB.   Accordingly, Defendants are entitled to summary judgment on Plaintiff's due process claim.

Plaintiff has also ostensibly raised a general due process claim by stating repeatedly, most recently in the Opposition, that he has "never [been] afforded any discovery, until after the proceedings were over."  (Hoskins Aff., Opp'n. Ex. 4, ¶ 12.)   Given the number of proceedings that Plaintiff has initiated, from equal employment opportunity complaints, to state and federal litigation, to a Personnel Security Appeals Board proceeding and an Merit Systems Protection Board appeal, it is entirely unclear to which proceedings he refers, much less what discovery it was that he sought.  Given his failure to provide any specific instances in which either he requested discovery that went unanswered, or filed a request for discovery that was denied by a court or administrative agency, summary judgment is not only appropriate but the only correct course with respect to this claim.

F.      Federal Tort Claims Act Claim

Plaintiff's tort claims are based on negligent and reckless infliction of emotional distress and malicious fraud.  Defendants contend that the United States may not be sued without its consent.  That consent must be unequivocally manifested in the text of a statute. *Williams v. United States*, 242 F.3d 169, 172 (4th Cir. 2001).   The FTCA provides the exclusive remedy for tort claims against the United States, *see* 28 U.S.C. § 2697(b)(1).  Moreover,

[a]n action shall not be instituted upon a claim against the United States for money damages for injury … caused by the negligent or wrongful act . . . of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first *presented the claim to the appropriate Federal agency[, which] shall have been finally denied by the agency in writing and sent by certified or registered mail.*

28 U.S.C. § 2675(a) (emphasis added).  Defendants have provided an affidavit to the effect that no such claim has been filed by Plaintiff (Affidavit of Lieutenant Commander Shanell King, Mot. Ex. 31, ¶ 4), and accordingly summary judgment is appropriate on this claim. *O'Donnell v. Bruce*, 2009 WL 737111 at *5 (E.D. Va. 2009) (granting summary judgment based on lack of jurisdiction where Defendant submitted affidavit from FBI that no administrative claims had been submitted by Plaintiff for intentional infliction of emotional distress); *Totten v. Norton*, 421 F.Supp.2d 115, 122-23 (D.D.C. 2006) (holding that plaintiff failed to exhaust administrative remedies against National Park Service for negligence and intentional infliction of emotional distress).

Plaintiff's response is without merit.  He claims in his reply that his "civil rights claims includes [sic] claims for distress."  (Reply at 7.)  He appears to be arguing that he is now bringing a section 1983 claim rather than one under the FTCA, but such a claim is meritless both as a matter of procedure and substance, as he never filed suit under section 1983 and it would not apply in any event to a personal injury action such as this one. Accordingly, Plaintiff's claim must be dismissed based on lack of subject matter jurisdiction.

## CONCLUSION

For the reasons stated above, the Motion for Damond Carter to Appear Pro Hac Vice for Plaintiff (ECF No. 23) is DENIED.  The Motion to Supplement Exhibits (ECF No. 28) and the Motion to Strike (ECF No. 27) of Defendants United States Coast Guard

and Janet Napolitano, Secretary of Homeland Security are GRANTED.     Finally,
Defendants' Motion for Summary Judgment (ECF No. 9) is GRANTED.

A separate Order follows.

Dated: November 26, 2012                         \_\_\_\_/s/_____
                                                 Richard D. Bennett
                                                 United States District Judge